OPINION
{¶ 1} Harry A. Jackson was indicted on October 10, 2001, charged with a single count of tampering with evidence, a felony of the third degree. The indictment stemmed from allegations that Mr. Jackson destroyed "a plastic bag and/or a controlled substance." Specifically, police officers claimed that they were in the process of questioning Jackson about an item in his possession which they suspected to be illegal drugs when Jackson ran away from them; while running away, he allegedly ate the contents of a small plastic bag. Additional details of the incident are addressed below in our discussion of the assignments of error.
{¶ 2} Defense counsel pursued discovery and filed a motion seeking suppression from evidence of any statements made by Mr. Jackson to the police.
{¶ 3} On January 9, 2002, the trial court conducted a hearing on the suppression motion. This brief hearing involved the testimony of only one witness, one of the two arresting officers. The trial court granted the motion to a limited extent — statements made by Mr. Jackson after he was placed inside the cruiser were suppressed; statements he made to the officers prior to that were not suppressed.
{¶ 4} Mr. Jackson's jury trial commenced on January 14, 2002.
{¶ 5} After the state rested its case, defense counsel moved for a mistrial, informing the trial court that due to illness, he believed he had rendered "substandard" counsel to Mr. Jackson, particularly with respect to the suppression issues. The trial court, noting that defense counsel had indicated that he could proceed to trial notwithstanding his illness, overruled the motion. The trial court also observed that defense counsel's suppression motion preserved any issues relating thereto for purposes of appeal.[1]
{¶ 6} Defense counsel then moved the court for a judgment of acquittal, pursuant to Crim.R. 29. This motion was also overruled.
{¶ 7} The defense rested without presenting any evidence.
{¶ 8} The jury returned a verdict of guilty on January 15, 2001. The trial court proceeded immediately to sentencing. Pursuant to an entry journalized January 16, 2002, the trial court sentenced Mr. Jackson to a two-year term of imprisonment.
{¶ 9} Harry A. Jackson ("appellant") has timely appealed his conviction, assigning two errors for our consideration:
{¶ 10} "I. Harry Jackson's conviction was based upon insufficient evidence.
{¶ 11} "II. Harry Jackson's conviction was against the manifest weight of the evidence."
{¶ 12} Because the assignments of error are interrelated, we address them jointly.
{¶ 13} Preliminarily, we set forth the well-established standards by which we are bound in reviewing the assignments of error, which challenge both the sufficiency of the evidence, and the manifest weight of the evidence. The standards are somewhat similar, yet distinct in theory and application.
{¶ 14} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
{¶ 15} "With respect to sufficiency of the evidence, '''sufficiency'' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *."
{¶ 16} When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
{¶ 17} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
{¶ 18} In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
{¶ 19} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
{¶ 20} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
{¶ 21} Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offense charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
{¶ 22} Returning to appellant's assignments of error, he argues that the prosecution failed to prove by sufficient evidence the elements of the offense of which he was convicted, tampering with evidence. As indicated infra, appellant further contends that his conviction was against the manifest weight of the evidence.
{¶ 23} The elements of tampering with evidence, as pertinent here, are set forth in R.C. 2921.12(A)(1), which reads:
{¶ 24} "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
{¶ 25} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
{¶ 26} Applying the foregoing to the facts of this case, we turn to the record to review the evidence adduced at trial.
{¶ 27} The state presented three witnesses, all of whom were employees of the Columbus Division of Police. Officers John Dollmatsch and Randall Lyons were the patrolmen who arrested appellant. Angela Farrington identified herself as a "criminalist in the drug chemistry section."
{¶ 28} Officer John Dollmatsch testified regarding his recollection of events culminating in appellant's arrest. During the evening of June 12, 2001, he and his partner, Randall Lyons, were "working direct patrol, special assignment looking for narcotics activity" in the area of Miami Avenue and East Spring Street. (Tr. 37-38.)
{¶ 29} When the officers first observed appellant, he was "standing on the sidewalk talking to another male." When "[i]t appeared they made a hand-to-hand deal between each other,[2]" the officers "drove around the corner to further investigate" what the two men were doing. According to Officer Dollmatsch, they next observed appellant "walking down the middle of the street," while the other man walked in the other direction. (Tr. 38-39.)
{¶ 30} Officer Dollmatsch explained that he and his partner "decided to approach [appellant] for committing [a] pedestrian in the roadway violation" because appellant "was walking down the middle of the street." The officers were still in their cruiser at the time. Dollmatsch claimed that when they approached appellant, they "noticed his right hand was clenched like a fist, like he was holding something." Dollmatsch testified that they intended to cite appellant for being in the roadway and that they were "also investigating." (Tr. 39-40.)
{¶ 31} Officer Dollmatsch testified that his partner, Randall Lyons, was driving the cruiser when Lyons pulled up "a couple feet away" from appellant. Officer Lyons asked appellant to approach the cruiser, and appellant complied. According to Dollmatsch, when appellant stepped over to the car, appellant "put his hands up to the window and he still had his hand clenched, right hand clenched." The officer believed that the time was "19:25 p.m.," stating that it was "right at dusk," in the "middle of summer" with "just a little bit of light out."[3] (Tr. 40.)
{¶ 32} According to Officer Dollmatsch, his partner then asked appellant what was in his hand. Dollmatsch testified that appellant responded that "he just had a little bit of weed, which we assumed was marijuana." At that point, his partner told appellant that he would have to "hand over the weed." Then, "my partner started opening up the cruiser door and [appellant] shoved the door shut and began running away from the cruiser." (Tr. 41.)
{¶ 33} The officers "began running after [appellant]." They ran in an area next to a vacant lot "which was covered with high weeds, approximately a foot and a half tall." Officer Dollmatsch testified that as appellant was "halfway across the field, he brought his hand up to his mouth and he put it in his mouth and he dropped the plastic baggy on the ground." Dollmatsch clarified that while he saw appellant "bring his hand up to his mouth, he was not sure what was in his hand at the time. Dollmatsch testified that his partner was "a little closer" than he was to appellant, "the first one right behind him." (Tr. 41-43.)
{¶ 34} According to Officer Dollmatsch, the officers only chased appellant for 20 to 25 yards. He estimated that he and his partner were "probably about ten feet behind" appellant when he (Dollmatsch) saw appellant drop the plastic bag. The officer stated that appellant immediately thereafter dropped to the ground. (Tr. 41-42.)
{¶ 35} Officer Dollmatsch testified that when appellant threw himself to the ground, his partner said that appellant was "trying to swallow something." As a result, his partner "sprayed [appellant] with mace in the face, try to keep him from swallowing whatever is in his mouth." At that point, appellant was subdued and handcuffed. Once they were back at the cruiser, the officers called a squad to treat appellant for the macing. (Tr. 43-44.)
{¶ 36} Officer Dollmatsch added that "right after" appellant was handcuffed, the officers "grabbed the plastic bag and checked the general area to see if anything else had been dropped close to the bag." (Tr. 45.)
{¶ 37} Over defense counsel's objection, the trial court allowed introduction into evidence of the plastic bag "where [appellant] bit it off," according to Officer Dollmatsch. The officer testified that the bag contained "a couple, a few specks of a white powdery substance," which the officers thought "might be crack cocaine residue." (Tr. 45.)
{¶ 38} On cross-examination, Officer Dollmatsch stated that he did not personally examine appellant's mouth after he was restrained with the macing and cuffing. He was not sure if Officer Lyons examined appellant's mouth either. (Tr. 50.)
{¶ 39} Officer Dollmatsch acknowledged on cross-examination that appellant was not taken to the hospital or anywhere else for any type of testing (i.e., blood testing) to ascertain whether appellant had ingested cocaine or anything else. (Tr. 52.)
{¶ 40} Upon further cross-examination, Officer Dollmatsch clarified that it was he who found the bag, "laying on the ground right where [appellant] dropped it." The officer estimated that the "baggy" was "probably less than ten feet" away from appellant after appellant dropped it and dropped to the ground. (Tr. 52-53.)
{¶ 41} Defense counsel next addressed the issue of lighting in the area at the time the officers were chasing appellant to the vacant lot. When defense counsel informed Officer Dollmatsch that the local newspaper indicated that "the sun set at 9:01" that evening, the officer responded that he could not dispute that issue. The officer could not recall whether there were any street lights on near the area of the vacant lot at the time. (Tr. 54.)
{¶ 42} Officer Dollmatsch identified "Defendant's Exhibit A" as a "traffic citation" he filled out charging appellant with "pedestrian in the roadway" or "jaywalking" or "fail[ure] to use crosswalk." (Tr. 54.)
{¶ 43} Defense counsel then turned to the subject of the plastic bag and its contents. Officer Dollmatsch explained that the officers did not believe that "the specks of powder" that were in the bag would be enough to conduct a preliminary test using the standard-issue "test kits" which are, essentially, initial field tests to detect the presence of cocaine. Instead, the officers determined that the bag would have to be submitted for more sophisticated laboratory testing at the police department. (Tr. 55.)
{¶ 44} Finally, on cross-examination, Officer Dollmatsch testified that during the approximately two hours appellant was in his presence following the arrest, appellant did not appear to "suffer any sort of ill effects but those for the mace." The officer noticed no seizures, disorientation, or vomiting. The clear intent of this line of questioning was to discern whether the officer noticed any symptoms suggestive of one being under the influence of cocaine. (Tr. 57.)
{¶ 45} On redirect examination, Officer Dollmatsch opined that even if appellant had been taken to a hospital for testing, drawing blood would not have revealed when any drugs might have been ingested. However, on recross examination, the officer conceded that he is not a toxicologist, physician, or chemist. (Tr. 58-60.)
{¶ 46} The state's next witness, Angela Farrington, identified herself as a "criminalist" in the drug chemistry section of the Columbus Police Department's Crime Laboratory. The trial judge sustained defense counsel's objection to the prosecution's request to "admit Ms. Farrington as an expert" in drug testing. Instead, the trial judge indicated that Ms. Farrington could simply testify regarding her analysis of the plastic bag at issue. (Tr. 61-63, 66.) Her analysis of the plastic bag revealed no "residue suitable for analysis." All Ms. Farrington could see were "a few very small flakes, * * * smaller than a grain of salt." The flakes "appear[ed] to be white in color." Given the small size of the substance in question, no testing was performed on it. Ms. Farrington documented her notes indicating that "no residue was observed." (Tr. 68-70.)
{¶ 47} On cross-examination, Ms. Farrington elaborated about the various analytical tools at her disposal to test samples submitted for examination, particularly for fine or trace amounts of various substances. For example, she can simply conduct a visual examination of a sample or substance; if the amount of the sample or substance is very fine, she might conduct an enhanced visual procedure by using magnification or a microscope. She also can conduct a chemical analysis. In this case, however, Ms. Farrington only went so far as to visually examine the substance; in short, she just looked at what little was in the bag, without "anything to enhance [the] examination," including using a microscope or magnification. She acknowledged that "bits of materials and substances that are not visually apparent can be detected by chemical examination," but agreed that, in this case, the plastic bag contained "nothing there worth even looking at." (Tr. 73-75.)
{¶ 48} Columbus Police Officer Randall Lyons was the state's third and final witness. As indicated infra, he was Officer Dollmatsch's partner the night appellant was arrested; again, Lyons was driving the cruiser that night.
{¶ 49} Officer Lyons' testimony, in most relevant aspects, was in accord with that of his partner. However, this officer did add several details. Lyons referred to their "task force" duty that evening as "PAC," meaning "directed patrol" with a purpose to "mostly target * * * drug dealers, sales and stuff like that — felons." (Tr. 76-77.)
{¶ 50} Officer Lyons, consistent with his partner, testified that he and his partner encountered appellant and another individual "conversing" that night at approximately 9:15 to 9:30. According to Lyons, when appellant and the other man saw the officers, "they split, went their separate ways." When Lyons turned the cruiser around to investigate further, appellant "was walking * * * down the middle of the street." When Lyons asked appellant to come over to the cruiser, appellant complied. When the assistant prosecutor asked the officer why the officers "focus[ed]" on appellant, Lyons' stated reason was "[b]ecause we noticed when [appellant] was walking down the middle of the street[,] he had his right hand — it was clutched shut as if he was holding something." In addition, appellant was "walking in the middle of the street, which is in itself a pedestrian in the roadway or failure to use crosswalk violation." (Tr. 77-79.)
{¶ 51} When asked about lighting conditions at the time, Officer Lyons testified that "it was about dusk" and that they "could see." (Tr. 79.)
{¶ 52} When appellant complied with Officer Lyons' request to come over to the cruiser, appellant approached on the driver's side. According to Lyons, appellant "still had his right hand shut and he placed both hands on the cruiser door where the window was down." Lyons asked appellant "what he was holding in his hand just for [Lyons'] safety, my partner's safety." Lyons elaborated, adding, "[i]n that area, it's just not uncommon to hold weapons in your hands or anything like that. So we wanted to clear that up." (Tr. 79.)
{¶ 53} Officer Lyons quoted appellant as saying, "`I've got a little bit of weed in my hand.'" Lyons told appellant to "hand it over," to which appellant responded, "`Oh man, you're going to take my weed from me?'" When the officer told him that he was going to take it, appellant refused to hand it over. (Tr. 79-80.)
{¶ 54} Officer Lyons described the following chain of events that ensued:
{¶ 55} "At that time, I attempted to open the cruiser door. It opened about two to three inches. [Appellant] slammed it shut and proceeded to run * * * through the yards.
{¶ 56} "* * *
{¶ 57} "I managed to get the door opened. I got out. We chased after him. I observed [appellant] holding a baggy in his right hand. I observed him put it up to his mouth, tear it away, throw the baggy.
{¶ 58} "As soon as he threw the baggy, he immediately dropped to the ground and had curled up almost like a fetal position. I was so close to him, I almost had to step over to him. I slid in the grass that was wet. I got up over him. I observed him trying to force himself to swallow.
{¶ 59} "I applied a two to three second burst of mace to his face in order to prevent him from swallowing whatever he was trying to swallow." (Tr. 80-81.)
{¶ 60} Officer Lyons testified that he "was close enough to see [appellant] holding the baggy the whole time. " (Tr.81.)
{¶ 61} After reiterating the substance of what his partner had earlier testified to regarding the macing, Officer Lyons also testified that neither officer looked inside appellant's mouth once they had him subdued.
{¶ 62} According to Officer Lyons, he observed a small amount of "white powdery residue inside the bag" that appellant had thrown to the ground. (Tr. 84.)
{¶ 63} The cross-examination of Officer Lyons was largely in accord with that of his partner. Lyons did, however, agree with defense counsel that if appellant had possessed "less than one hundred grams" of marijuana, the officers would have issued appellant a citation for a minor misdemeanor, and appellant would have "just walk[ed] away." (Tr. 96.)
{¶ 64} The evidence in this case is sufficient. The state offered proof to the jury of each element of the tampering statute set forth infra. Appellant takes issue with the purported lack of evidence offered to prove that appellant knowingly "alter[ed]" or "destroy[ed]" "any * * * thing" with the purpose of impairing "its value or availability as evidence." We disagree.
{¶ 65} We must concur, instead, with the state's position that the two officers' testimony, "if believed," provided sufficient evidence upon which the jury could base a finding that appellant knowingly altered or destroyed an item being investigated by them as illegal drugs. By its verdict, this jury clearly believed the officers' testimony that appellant admitted having illegal drugs in his possession and that while fleeing to avoid the potential consequences, he swallowed the contents of the plastic bag and dropped the bag before surrendering.
{¶ 66} In a similar vein, the state of this record does not permit us to reverse appellant's conviction based upon the manifest weight of the evidence. We cannot say the "jury clearly lost its way" in convicting appellant, based upon the evidence presented to the jury, such that a "manifest miscarriage of justice occurred" such as that contemplated by Thompkins.
{¶ 67} Given our careful review of this record, and the standards of review by which we are bound, we must conclude that appellant's conviction for tampering with evidence was supported by sufficient evidence, and the conviction was not against the manifest weight of the evidence.
{¶ 68} The assignments of error are overruled.
{¶ 69} Having overruled both assignments of error, the judgment of the trial court is affirmed.
Judgment affirmed.
DESHLER and PETREE, JJ., concur.
[1] Appellate counsel has not raised issues pertaining to the trial court's disposition of the motion to suppress or issues related to trial counsel's self-professed ineffectiveness.
[2] Defense counsel objected to this testimony, but the objection was overruled. (Tr. 38.)
[3] There is an obvious, but inconsequential error of some sort in the "19:25" reflected in the transcript (so-called "military time"), either by the court reporter or by the officer. While "19:25 p.m." translates to 7:25 p.m., the record is clear that this occurred later, at approximately 9:00 or 9:30 p.m. (See, e.g., Tr. at 51; Officer Dollmatsch testifies on cross-examination that the time of arrest was 9:25.)